UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:21-CV-63-RGJ

GPH LOUISVILLE HILL CREEK LLC, ET                                    Plaintiffs
AL.,

v.

REDWOOD HOLDINGS, LLC, ET AL.,                                       Defendants

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Plaintiffs/Counterclaim Defendants GPH Louisville Hillcreek LLC, GPH Louisville

Camelot LLC, GPH Louisville Mt. Holly LLC, GPH Louisville St. Matthews LLC, GPH Frankfort

LLC, GPH Kirtland LLC, GPH Vanceburg LLC, GPH Stanford LLC, and GPH Greensburg LLC

("Plaintiffs") move to dismiss [DE 41][1] the First Amended Counterclaim filed by

Defendants/Counterclaim Plaintiffs Redwood Holdings, LLC ("Redwood"), Hillcreek Leasing,

LLC, Camelot Leasing, LLC, Mt. Holly Leasing, LLC, St. Matthews Leasing, LLC, Frankfort

Leasing, LLC, Kirtland Leasing, LLC, Vanceburg Leasing, LLC, Stanford Leasing, LLC, and

Green Hill Leasing, LLC (all entities other than Redwood are "Facility Operators"); and Eli M.

Gunzburg ("Gunzburg") (collectively "Defendants" or "Counterclaim Plaintiffs"). The matter is

ripe. [DE 16; DE 20; DE 22; DE 23]. For the reasons below, Plaintiffs' Motion to Dismiss [DE

41] is GRANTED in part and DENIED in part**.**

---

[1] Plaintiffs previously moved to dismiss Defendants' original counterclaims. [DE 23]. Defendants then filed
an Amended Counterclaim [DE 40], which became the operative pleading.  Thus, Plaintiffs' first motion to
dismiss is denied below as moot.

1

# I.     BACKGROUND

The well-pleaded factual allegations in the First Amended Counterclaim are accepted as true for purposes of Plaintiffs' motion to dismiss. *See Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)).

This case involves a dispute between Plaintiffs, as landlords, and Defendants, as tenant, sub-tenants, and guarantor. Plaintiffs are the owners of eight skilled nursing facilities in Kentucky and Ohio. [DE 1 at 6, ¶ 25]. Plaintiffs and Redwood entered into a Master Lease, Amended and Restated Master Lease, and First Amendment to Amended and Restated Master Lease which collectively include the eight of the skilled nursing facilities at issue in this lawsuit. [DE 40 at 417-18, ¶¶ 25-31]. Copies of these documents are attached to the First Amended Counterclaim. [DE 40-1, 40-2, 40-3]. Gunzburg guaranteed these leases. [DE 1 at 6-7, ¶¶ 25, 27, 28]. Redwood sublet or assigned these agreements to its wholly owned subsidiaries, the Facility Operators. [*Id*. at 418-19, ¶ 34]. The lease terms were collectively November 1, 2016 through October 31, 2019. [DE 40 at 418, ¶ 30].

Defendants allegations surround the due diligence process. Defendants allege that Plaintiffs produced documents during the due diligence process and made false representations and promises intending to induce Defendants to enter into the leases. [DE 40 at 414, ¶ 2]. Defendants allege that Nicholas Finn ("Finn") "represented that the accounting methodology used [in the financial statements produced by Plaintiffs] accurately reflected the financial status of the entities, especially in light of certain professional and general liability issues." [*Id*. at 418, ¶ 33]. Defendants allege this was "a knowing and intentional misrepresentation" by Finn and that "wrongful death actions against [Plaintiffs] were far more robust and costly than represented." *Id*.

Defendants allege facts surrounding the parties' agreement. Defendants allege that Plaintiffs made verbal promises "with respect to certain aspects" of the leases that Plaintiffs renounced. [*Id.*, ¶ 3]. Redwood paid a security deposit as required by Section 3.01 of the Master Lease. [DE 40 at 419, ¶¶ 35-36]. Defendants allege that upon an event of default, the Plaintiffs were supposed to apply the security deposit to any obligation of the tenant under the lease or return the security deposit within sixty days of the lease term expiring. [DE 40 at 419, ¶ 37]. Defendants failed to pay rent during the months of August, September, and October 2019. [DE 40 at 419, ¶ 38]. But Defendants allege that Finn waived all late fees associated with past due rent on August 15, 2019, and later agreed on September 10, 2019 to allow the security deposit to be applied to the August, September, and October 2019 rent and reaffirmed waiver of fees. [*Id.* at 419,¶¶ 39-41]. Defendants allege that they informed Finn that their cash flow was impaired after their lender reduced their borrowing base. [*Id.* at 410, ¶ 42]. But Plaintiff ultimately did not waive the late fees for the past due rent and did not apply the security deposit to the past due rent. [*Id.* at 420, ¶ 42]. Defendants allege this was in retaliatory because Defendants counterclaimed in a civil action pending in Jefferson Circuit Court.[2]

Defendants also allege facts surrounding the issue of certifying nursing home beds. Defendants allege that during negotiations they expressed "concern over the number of licensed nursing home beds associate with the Kirtland facility . . . that [it] had more licenses nursing home beds than the market could possibly bear." [*Id.* at 420, ¶ 47]. Defendants allege Finn was aware of this and agreed in October and November 2016 to decertify excess licensed beds.  [*Id.* at 420, ¶ 48]. Defendants also allege "Section 18.4 was amended and revised in the Amended and Restate Master Lease" providing that Plaintiffs "approval for the decertification of licensed nursing home

---

[2] The parties have not explained how this case is related.

beds at the Kirtland facility would not be 'unreasonably withheld, conditioned or delayed.'" [*Id.* at 420, ¶¶ 49-52]. Plaintiffs requested authorization to decertify 60 licensed beds at the Kirtland facility, but "Defendants refused to allow" Plaintiffs to decertify the beds. [*Id.* at 420, ¶¶ 53-55]. Plaintiffs later requested to decertify 81 beds at the Kirtland facility because excess beds were impairing reimbursement rates from the State of Ohio.  [*Id.* at 421, ¶¶ 58-61]. Defendants assessed capital improvement amounts to Plaintiffs against the licensed beds that Plaintiffs wanted decertified. [*Id.*, ¶ 62]. Plaintiffs allege that because of Defendants' refusal to decertify beds they "incurred expenses, including, but not limited to, bed taxes, a reduction in the Medicaid rate, and capital expenses." [*Id.*, ¶ 63].

Defendants allege that Plaintiffs retained property that belongs to Defendants. Defendants also allege facts surrounding required capital improvements to the facilities. Defendant had to expend a certain amount per year for capital improvements and if the amount expended was less than required, they were to deposit the deficiency with the Defendants, but if it was more than required the Defendants had to return the excess amount to the Plaintiffs. [*Id.* at 423, ¶ 64]. Defendants admitted that they owed Plaintiffs $354,654.43 in excess capital expenditures at the end of the lease but refuse to pay it. [*Id.*, ¶ 65]. Plaintiffs also acknowledge they owe Defendants money for the purchase of beds but refuse to pay it.   [*Id.*, ¶ 67].

Plaintiffs sued the tenant Defendants as a result of the unpaid rent for breach of the Master Lease and Gunzburg for breach of guaranty. [DE 1]. Defendants counterclaimed against Plaintiffs for breach of contract, unjust enrichment, promissory estoppel, conversion, fraud in the inducement, and negligent misrepresentation based on the allegations summarized above. [DE 40]. Plaintiffs now move to dismiss Defendants' counterclaims.

## II.     STANDARD

Federal Rule of Civil Procedure 12(b)(6) instructs that a court must dismiss a complaint if the complaint "fail[s] to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6). To properly state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). A pleading must contain "a demand for the relief sough, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a)(3). When considering a motion to dismiss, courts must presume all factual allegations in the complaint to be true and make all reasonable inferences in favor of the non-moving party. *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citation omitted). "But the district court need not accept a bare assertion of legal conclusions." *Tackett*, 561 F.3d at 488 (citation omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "A complaint will be dismissed . . . if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561–64).

In ruling on a motion to dismiss, the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein" without converting to a summary judgment. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

### III.    DISCUSSION

Plaintiffs move to dismiss all of Defendants counterclaims. Each counterclaim will be addressed below. The Plaintiffs' arguments center on the parties' written agreements, which were attached to the Defendants' Amended Counterclaim. Because these written agreements were attached to the Amended Counterclaim, and appear central to the Amended Counterclaim, the Court may consider these documents without converting the motion to summary judgment. However, the Court will not consider other documents outside the pleadings, such as the email attached to the Defendants' response and declines to convert any ruling to one on summary judgment. *See Shelby Cty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund,* 203 F.3d 926, 931 (6th Cir. 2000) (whether to consider evidence outside the pleadings and convert a motion to dismiss into a motion for summary judgment is committed to the discretion of the court).

### A.  Breach of Contract

Plaintiffs argue that the Defendants' counterclaim for breach of contract fails under the Master Lease. The Master Lease provides that it will be governed, construed, and enforced under the laws of Delaware except that the law of the "Situs State" governs procedures for enforcing, in the Situs State, provisional, and other remedies directly related to facilities and personal property "as may be required pursuant to the law of such Situs State, including without limitation the

6

appointment of receiver" and as "necessary create, perfect and foreclose the security interest and liens created under this Lease." [DE 40-1 at 475, ¶ 24.10 Governing Law]. Plaintiffs note that the Master Lease is interpretated and enforced under Delaware law, which Defendants do not dispute, but states that the basic standards of contract interpretation are the same under Delaware and Kentucky law and thus, a choice-of-laws analysis is not required at this stage of the proceedings. [DE 41 at 632, n.5]. The Court applies Delaware law to construe the Master Lease, and Kentucky law, if it is consistent. The Court will analyze Defendants' various grounds for breach of contract with this framework in mind.

To state a claim for breach of contract under Delaware or Kentucky law, a plaintiff must allege: (1) the existence of a contract; (2) the breach of that contract; (3) damages flowing from the breach. *H-M Wexford LLC v. Encorp, Inc*., 832 A.2d 129, 140 (Del. Ch. 2003), *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009). Defendants' counterclaim for breach of contract alleges five breaches, all of which Plaintiffs claim fail as a matter of law under the language of the Master Lease or for failing the plausibility test. The Court will address each aspect of the breach of contract counterclaim below.

The interpretation of a contract is a question of law. *Seidensticker v. Gasparilla Inn, Inc*., 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007) (citing *HIFN, Inc. v. Intel Corp*., 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007)). To determine the meaning of a contract, courts begin with its plain language. *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016); *BLGH Holdings LLC v. enXco LFG Holding, LLC*, 41 A.3d 410, 414 (Del. 2012). Without an ambiguity, a court will enforce a contract strictly according to its terms based on the ordinary meaning of its language and without resort to extrinsic evidence. *Ky. Shakespeare Festival, Inc*., 490 S.W.3d at 694; *BLGH Holdings LLC*, 41 A.3d at 414.

But if there is more than one reasonable construction of contractual language, then the contract is ambiguous. *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 615 (Del. 2003) ("Ambiguity exists 'when the provisions in controversy are reasonably or fairly susceptible of different interpretations.'" (quoting *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc.,* 691 A.2d 609, 613 (Del.1996))). But a contract is not ambiguous "simply because the parties disagree on its meaning." *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co*., 693 A.2d 1059, 1061 (Del. 1997). Dismissal of Defendants' breach of contract counterclaim under Rule 12(b)(6) is appropriate only if Plaintiffs'' "interpretation of the contract on which their theory of the case rests is the 'only reasonable construction as a matter of law.'" *Kahn v. Portnoy*, 2008 WL 5197164, at \*3 (Del. Ch. Dec. 11, 2008) (quoting *VLIW Tech.*, 840 A.2d at 615).[3]

The Delaware Statute of Frauds prohibits enforcement of any agreement "upon any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them, or upon any agreement that is not to be performed within the space of 1 year from the making thereof," unless the agreement is in writing signed by the party to be charged. 6 Del. C. § 2714(a). The Kentucky Statute of Frauds also requires that a lease of real estate for longer than one year be in writing and signed by the party to be charged. KRS § 371.010(6).

---

[3] Kentucky contractual construction is similar. "The construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. App. 2000) (citing *Hibbitts v. Cumberland Valley Nat. Bank & Tr. Co.*, 977 S.W.2d 252, 254 (Ky. App. 1998)). An "ambiguous contract" is one capable of more than one reasonable interpretation. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). "If an ambiguity exists, the court may look to extrinsic evidence to determine the intent of the parties." *Principal Life Ins. Co. v. Doctors Vision Ctr. I, PLLC*, No. 5:12-CV-00125-JHM, 2014 WL 6751201, at \*6 (W.D. Ky. Dec. 1, 2014) (citation omitted). If a contract is unambiguous, however, it "will be enforced strictly according to its terms." *Elmore v. Com.*, 236 S.W.3d 623, 627 (Ky. App. 2007) (citations omitted). "[A] court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear*, 103 S.W.3d at 106 (citation omitted). In other words, "[i]f there is no ambiguity, the court's analysis extends only to the four corners of the contract to determine the parties' intention." *Journey Acquisition-II, L.P. v. EQT Prod. Co.*, 39 F. Supp. 3d 877, 887 (E.D. Ky. 2014) (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000)).

1.  <u>Security Deposit and Waiver of Late Fees</u>

Defendants' counterclaim for breach of contract alleges that Plaintiffs breached the

contract by "failing and refusing to apply the Security Deposit to rent owed, failing and refusing

to waive all late fees related to past due rent, failing to return the Security Deposit . . ." [DE 40 at

424, ¶ 73]. Article III of the Master Lease required the tenant, Redwood, to pay a security deposit

of $1,312,500, which Redwood paid. [DE 40-1 at 439-40, § 3.1]. Article III further provided these

terms as to the security deposit:

> The Security Deposit shall not be deemed an advance payment of Rent or
> a measure of Landlord's [Plaintiffs'] damages for any default under this
> Lease by Tenant, nor shall it be a bar or defense to any action that Landlord
> may at any time commence against Tenant. [*Id*. § 3.1.1].
>
> Upon the occurrence of any Event of Default, Landlord, at its option and
> in such order as Landlord in its sole discretion may determine, may apply
> the Security Deposit to any (a) obligation of Tenant under this Lease, or (b)
> Losses that Landlord may incur in connection with, or related to, this Lease,
> or any Event of Default under this Lease . . . ." [*Id*. § 3.1.2].
>
> If no Event of Default has occurred and is continuing under this Lease and
> Tenant has fully performed and satisfied all of its obligations under this
> Lease, then Landlord shall pay the Security Deposit, or remaining
> unapplied portion thereof, to Tenant within sixty (60) days after the
> expiration or earlier termination of this Lease and the surrender of the
> Premises to Landlord in accordance with the terms of this Lease.  was there
> an obligation for Plaintiffs to return the Security Deposit to Redwood after
> the expiration of the Master Lease [*Id*. § 3.1.5].

The Master Lease also contains a no oral modifications clause in Article 24.11, which states in

part: "<u>Entire Agreement</u>. This Lease constitutes the entire agreement of the parties with respect to

the subject matter hereof, and may not be changed or modified expect by an agreement in writing

signed by the parties." [DE 40-1 at 475].

Defendants allege that Plaintiffs' representative, Finn, orally agreed to apply the security

deposit to the unpaid three months' rent, agreed to waive all late fees, and owed the rest of the

security deposit to Defendants, but that Plaintiffs breached these promises to retaliate against Defendants for counterclaiming in a separate lawsuit. [DE 40 at 419,¶¶ 37-42].

Plaintiffs argue that Finn's oral promise to apply the security deposit to the unpaid rent and waive late fees cannot support a breach of contract claim because such allegations, even if true, do not violate the plain language of Article III the Master Lease that gave Plaintiffs "sole discretion" to determine whether to apply the security deposit to any rent.   Plaintiffs assert that the parties agree that Defendants failed to pay three months' rent, and thus Defendants were in default, and per thus under the plain language of Article III, the security deposit was not required to be returned to Defendants because they were in default. [DE 41 at 635-36]. Plaintiffs also argue the statute of frauds barred the alleged oral agreement to apply the security deposit to rent and waive the late fees. [DE 41 at 623-35].

Defendants disagree that their breach of contract counterclaim on the security deposit and waiver of late fees is barred by the statute of frauds. They argue that Finn's oral agreement to apply the security deposit to rent and waive fees does not materially modify the Master Lease, and thus the statute of frauds does not apply. [DE 42 at 659-60 citing *Farmers Bank & Tr. Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc*., 171 S.W.3d 4, 8 (Ky. 2005) ("Farmers' original contract to lend to Willmott falls within the coverage of . . . the statute of frauds. Farmers' alleged promises, oral or otherwise, to postpone the closing date must also comply with the statute of frauds if extending the closing date *materially* affects the terms of the written agreement") (emphasis added) citing *Murray v. Boyd*, 177 S.W. 468, 471–72 (1915) ("If the contract is required to be in writing, evidence will not be admitted to prove a subsequent parol agreement which *materially* modifies the writing; that is, if the subsequent agreement is itself within the statute of

frauds, and of a nature required by law to be in writing.") (emphasis added) and *Specht v. Stoker*, 314 Ky. 786, 237 S.W.2d 78, 79 (1951)].

While the Court has concerns as to the ultimate strength of this argument, taking the allegations as true and in a light most favorable to Defendants, dismissal of the breach of contract counterclaim for the alleged oral agreement to apply the security deposit to rent and waive fees would be inappropriate at this stage of the proceedings. Whether the oral agreement amounted to a material change in the Master Lease is a question of fact. "What terms are material is determined on a case-by-case basis, depending on the subject matter of the agreement and on the contemporaneous evidence of what terms the parties considered essential." *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1230 (Del. 2018).   Plaintiffs counter that any oral agreement fails for lack of consideration. [DE 43 at 677-78]. But that issue would also involve questions of fact and likewise fails at this stage of the proceedings. The facts, as pled, allow the Court to draw a reasonable inference that Plaintiffs breached the oral contractual obligation and is therefore liable for the misconduct alleged. *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556 (2007)). Thus the Plaintiffs' motion to dismiss Defendants' breach of contract counterclaim on the security deposit and fees is **DENIED**.

### 2.  Decertification of Beds

Defendants allege that Plaintiffs breached the parties' agreements by "failing to permit the decertification of licensed nursing home beds at the Kirtland facility." [DE 40 at 424]. Defendants make several allegations surrounding this claim. The Amended and Restate Master Lease provides in Section 18.4 that "Tenant may submit a written notice to Landlord requesting that Landlord approve the . . . de-licensure of a portion of the Excess beds . . . [s]uch written request shall include a detailed description . . . approval for the decertification of licensed nursing home beds at the

11

Kirtland facility would not be "unreasonably withheld, conditioned or delayed.'" [*Id*. at 420, ¶¶ 49-52]. Whether the Plaintiffs breached the agreement by unreasonably withholding, conditioning or delaying the decertification of beds is a question not suitable at this stage of the proceedings. Defendants argue that Plaintiffs failed allege that they made a written request that complied with Section 18.4. [DE 41 at 636]. But Defendants allege that they "have fulfilled their obligations under the Agreements" and the Court takes this allegation as true. The Court finds Defendants have alleged the necessary elements for a counterclaim for breach of contract based on the bed certification issue and whether Defendants complied with the terms of the contract is a defense to the counterclaim and involves a question of fact not suited for this stage of the proceedings. Plaintiffs' motion to dismiss on the bed certification aspect of the counterclaim is **DENIED**.

### 3. Capital Expenditures Amount

Defendants allege that Plaintiffs breached the parties' agreements by "failing to refund the Excess Capital Expenditures Amount." [DE 40 at 424]. Plaintiffs argue that this counterclaim fails under the plain terms § 7.6.1 of the Master Lease which provided that an overage was due only if the Defendants made capital expenditure deposits and there was no event of default. Plaintiffs argue that Defendants admit they did not pay three months' rent. While it is true Defendants admit to not paying the rent, for the reasons stated above under Section 3(A)(1) the Defendants have pled an oral agreement that modified the agreement to allow the security deposit to apply to the unpaid rent. As stated above, Defendants argue that this agreement amounted to a non-material change in the Master Lease that would not be prevented by the statute of frauds and whether a modification is material is a question of fact. The Court does not assess the strength of this argument at this stage of the proceedings. The Court finds Defendants have pled the necessary elements for a counterclaim for breach of contract based on the capital expenditures issue and whether

Defendants complied with the terms of the contract is a defense to the counterclaim that involves questions of fact. The Court does not consider the email correspondence that Defendants' attach to their response, although Defendants allege in the Amended Counterclaim that Plaintiffs admitted to owing a specific amount in capital expenditures to the Defendants. Plaintiffs' motion to dismiss on the capital expenditure aspect of the counterclaim is **DENIED**.

### 4. Purchase of Beds and Rentals

Defendants allege that Plaintiffs breached the parties' agreements by "failing to reimburse [Defendants] for the bed purchases and rentals." [DE 40 at 424]. Defendants allege that Plaintiffs acknowledge correspondence that they owe Defendants money for the purchase of beds but refuse to pay it.  [*Id*., ¶ 67]. Plaintiffs point out that under § 5.1 of the Master Lease, the tenants accepted the leased premises "as is" and that under § 6.1 of the Master Lease, "Tenant shall obtain and install all items of furniture, fixtures, supplies and equipment not included as Landlord Personal Property as shall be necessary or appropriate to operate each Facility in compliant with the Lease . . ." [DE 41 at 640]. "Landlord Personal Property" is defined in the Master Lease as "machinery, equipment, furniture and other personal property described in Exhibit C attached to this Lease, together with all replacements, modifications, alteration and substitutes thereof (whether or not constitution an upgrade)." [DE 40-1 at 485]. Exhibit C to the Master Lease further describes what property constitutes "Landlord Personal Property" as "all machinery, equipment, furniture and other personal property **located at or about any Facility** but excluding the following": "(b) all office supplies, medical supplies, food supplies, housekeeping supplies, laundry supplies, and inventories and supplies physically on hand at the Facility . . ." [DE 40-1 at 496] (emphasis added).

Plaintiffs interpret the language of these various provisions cited above from the Master Lease to mean that if any equipment was needed at a facility that was not already located at the

facility, Defendants had to purchase that equipment per § 6.1 of the Master Lease. [DE 41 at 641].

Otherwise any equipment already at the facility was "Landlord Personal Property." Defendants

argue that the word "furniture" is undefined and ambiguous as to whether it would include

"medical beds licenses for use the facility . . ." [DE 42 at 662]. The Defendants' interpretation of

the Master Lease on this issue is the only reasonable interpretation. § 6.1 of the Master Lease

required the tenant to obtain all "furniture" and "equipment" necessary to operate the facility and

the "Landlord Personal Property" included only the "equipment" and "furniture" "located at or

about any Facility."  Assigning ordinary meaning to the terms "furniture" and "equipment," there

is no credible argument that these terms are ambiguous as "medical beds" could fall under either

term. Because the Court finds the contract provisions cited above unambiguous on this point, its

analysis is limited to the four corners of the contract and does not resort to extrinsic evidence such

as the November 19 email attached to Defendant's response brief.

But then there is the question of what happens to the property bought by the tenant when

the tenant surrenders the premises. Section 14.3 of the Master Lease outlines what happens to

personal property:

> **14.3  Tenant Personal Property**. **Provided that no Event of Default then exists**, in connection with the surrender of the Premises, Tenant may upon at least five (5) Business Days prior notice to Landlord remove from the Premises in a workmanlike manner all Tenant Personal Property . . . ; provided that Landlord shall have the right and option to purchase for itself or its designee the Tenant Personal Property for its then fair market value during such five (5) Business Day notice period, in which case Tenant shall so convey the Tenant Personal Property to Landlord or its designee by executing a bill of sale in a form reasonably required by Landlord. **If there is any Event of Default then existing,** Tenant will not remove any Tenant Personal Property from the Premises and instead will, on demand from Landlord, convey it to Landlord or its designee for no additional consideration by executing a bill of sale in a form reasonably required by Landlord. Title to any Tenant Personal Property which is not removed by Tenant as permitted above upon the expiration of the Term shall, at Landlord's election, vest in Landlord or its designee; . . .

[DE 40-1 at 465-66] (emphasis added). Thus, under this provision, if a default occurs, Defendants are required, upon demand from Landlord, to convey its personal property to the Landlord. If there was no default, then Landlord may purchase the Tenant's personal property or the Tenant could remove it. While it is true Defendants admit to not paying the rent, for the reasons stated above under Section 3(A)(1) the Defendants have pled an oral agreement that modified the agreement to allow the security deposit to apply to the unpaid rent. As stated above, Defendants argue that this agreement amounted to a non-material change in the Master Lease that would not be prevented by the statute of frauds. Whether a modification is material is a question of fact. Thus, whether Defendants were in default is an issue of fact to be resolved and what should have happened to the beds under the contract is in dispute. The Court does not assess the strength of this argument at this stage of the proceedings. Plaintiffs' motion to dismiss Defendants' counterclaim for breach of contract as to reimbursement of the purchase of beds and rentals is **DENIED**.

### B.  Unjust Enrichment[4]

Defendants assert a claim against Plaintiffs for unjust enrichment, alleging that they conferred "certain benefits upon [Plaintiffs] including, without limitations, use of the Security Deposit for great than 60 days following the conclusion of the Lease Term, use of the Excess Capital Expenditures Amount for greater than a reasonable period of time following conclusion of the Lease Term, the payment of expenses associating with operating excess license nursing home beds at the Kirtland facility, and purchase and rental of beds."   [DE 40 at 423].

---

[4] The parties apply Kentucky law in their briefing to the remaining non-contractual claims at issue, and Plaintiffs cite *Tractor & Farm Supply, Inc. v. Ford New Holland, Inc*., 898 F. Supp. 1198, 1203 (W.D.Ky. 1995) for the proposition that Delaware law applies to the contract claims due to the choice-of-law clause in the Master Lease and Kentucky law applies to the non-contractual claims. The Court will apply Kentucky law to the analysis of the remaining claims.

"The claim for unjust enrichment is a legal fiction created to permit recovery where equity says there should be recovery, although there is no recovery in contract." *Holley Performance Prods., Inc. v. Keystone Auto. Operations, Inc.*, No. 1:09-CV-00053-TBR, 2009 WL 3613735, at *5 (W.D. Ky. Oct. 29, 2009) (citing *Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. App. 1987)). For a "[p]laintiff to prevail under unjust enrichment, it must establish three elements: (1) a benefit conferred upon [a] defendant at [the] plaintiff's expense; (2) a resulting appreciation of benefit by [the] defendant; and (3) inequitable retention of benefit without payment for its value." *MidAmerican Distrib. Inc.*, 807 F. Supp. 2d at 680.

Under Kentucky law, "[t]he doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed." *Codell Const. Co. v. Commonwealth of Kentucky*, 566 S.W.2d 161, 165 (Ky. App. 1977). Where a contract applies and covers the subject matter of the unjust enrichment claim, unjust enrichment claims have been dismissed. *Res-Care, Inc. v. Omega Healthcare Investors, Inc.*, 187 F. Supp. 2d 714, 719 (W.D.Ky. 2001); *Shane v. Bunzl Distrib. USA, Inc.*, 200 F. App'x 397, 404 (6th Cir. 2006) (affirming dismissal of unjust enrichment claim due to explicit contract). The Defendants do not dispute the validity of the Master Lease in their Answer [DE 16, Answer, ¶24] and argue non-material oral agreements were made to modify the parties' agreements as to applying the security deposit to the unpaid rent. But, as discussed below, the Defendants' counterclaim for fraud in the inducement will be permitted to go forward at this stage of the case. It is unclear and the parties have not addressed how that could impact the enforceability of the contracts in this case. As a result, the Court will allow the alternatively pled unjust enrichment claim to go forward at this stage of the litigation. Fed. R. Civ. P. 8(e)(2)(permitting pleading in the alternative and even the pleading of inconsistent claims).  The Court thus **DENIES** Plaintiffs' motion to dismiss on this basis.

### C. Promissory Estoppel

Defendants assert a claim against Plaintiffs for promissory estoppel, alleging that Plaintiffs "made multiple promises . . .including, without limitation, that the Security Deposit would be applied to rent for the months of August, September, and October 2019, that all late fees for past due rent would be waived, that Counterclaim Plaintiffs would be authorized to reduce the number of licensed nursing home beds at the Kirtland facility, and that Counterclaim Defendants would reimburse Counterclaim Plaintiffs for the amounts expended to purchase and rent beds." [DE 40 at 426]. Defendants allege that they "reasonably relied" on those promises by not "paying rent during the months of August, September, and October 2019," not "paying late fees," entering into the Master Lease, and "purchasing beds." [DE 40 at 426].

The Kentucky doctrine of promissory estoppel is: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only be enforcement of the promise." *Sawyer v. Mills*, 295 S.W.3d 79, 89 (Ky. 2009). To that effect, the required elements to state a claim for promissory estoppel under Kentucky law are: "(1) a promise; (2) which the promisor should reasonably expect to induce action or forbearance on the part of the promisee; (3) which does induce such action or forbearance; and (4) injustice can be avoided only by enforcement of the promise." *Schlenk*, 2016 WL 6836945, at *3. *See also Bergman v. Baptist Hosp. Sys., Inc.*, 344 F. Supp. 2d 998, 1003 (W.D. Ky. 2004); *McCarthy v. Louisville Cartage Co., 796 S.W.2d 10, 11 (Ky. App. 1990).* Similar to the principle discussed above on unjust enrichment, promissory estoppel "cannot be the basis for a claim if it represents the same performance contemplated under a written contract." *Derby City Capital, LLC v. Trinity HR Servs*., 949 F. Supp. 2d 712, 729 (W.D. Ky. 2013). The performances contemplated as to the security deposit, capital

17

expenses, decertification of beds, and reimbursement for beds and rentals are all contemplated by the parties agreements. But because the Court is permitting the Defendants' counterclaim for fraud in the inducement to move forward and the parties have not addressed how that claim could impact the contracts' enforceability, the Court will allow the promissory estoppel claim to remain (for now). Thus, for the same reason as Defendants' counterclaim for unjust enrichment, the Court **DENIES** Plaintiffs' motion to dismiss on this basis.

### D. Conversion

Defendants assert a claim against Plaintiffs for conversion, alleging that Plaintiffs "made multiple promises . . .including, without limitation, that the Security Deposit would be applied to rent for the months of August, September, and October 2019, that all late fees for past due rent would be waived, that Counterclaim Plaintiffs would be authorized to reduce the number of licensed nursing home beds at the Kirtland facility, and that Counterclaim Defendants would reimburse Counterclaim Plaintiffs for the amounts expended to purchase and rent beds." [DE 40 at 426]. The elements of a conversion claim are (1) ownership rights in a certain property, (2) the wrongful act of taking or disposing of property, and (3) causing damages. *Davis v. Siemens Med. Sols. USA, Inc.,* 399 F. Supp. 2d 785, 801 (W.D. Ky. 2005), *aff'd*, 279 F. App'x 378 (6th Cir. 2008) citing *Anderson v. Pine S. Cap., LLC,* 177 F. Supp. 2d 591, 603 (W.D.Ky.2001); *Goss v. Bisset,* 411 S.W.2d 50, 53 (Ky.1967). Defendants allege that they had ownership rights in the beds, and that the beds remain at the facilities and Plaintiffs have not paid for the beds, thus, causing Defendants damage. [DE 40 at 426, ¶¶ 88–95]. At this early stage, Defendants' assertions must be assumed true and taken in a light most favorable to Defendants. Plaintiffs argue that Defendants were in default and thus the beds were required not to be returned but as noted above, there are disputes about whether the alleged oral agreement about the three months' rent is valid and

18

enforceable. Thus, it would be inappropriate for the Court to dismiss Defendants' counterclaim for conversion. The motion to dismiss on this basis is **DENIED**.

### E. Fraud in the Inducement

Defendants allege that Plaintiffs made two fraudulent representations that induced them to enter into certain agreements. First, Defendants allege that Finn fraudulently represented the accounting methodology used by Plaintiffs was true and accurate as to the monies allocated for costs associated with the defense of nursing homes negligence and wrongful death claims and that Plaintiffs produced false and misleading financial statements. [DE 40 at 427]. These alleged fraudulent misrepresentations were during "the due diligence period." *Id.* Defendants' allegations suggest that these materials were sent before executing the parties' three written agreements. [DE 40 at 417, ¶ 27].

Second, Defendants allege that Finn represented that Plaintiffs would authorize the decertification of the excess licensed beds at the Kirtland facility. *Id.* Defendants allege these fraudulent representations induced them to execute the Amended and Restated Master Lease, sustaining damages. *Id.* at 428.

"Fraudulent inducement 'attends conduct prior to striking the express or implied contract and alleges that one party tricked the other into contracting. It is based on precontractual conduct which is, under the law, a recognized tort.'" *Lillard v. Univ. of Louisville*, 2012 WL 5878715, at *4 (W.D.Ky. Nov. 21, 2012) (quoting *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 193 F.3d 415, 439 (6th Cir. 1999)). A fraud in the inducement claim has six elements under Kentucky law: (1) material representation, (2) which is false, (3) known to be false or made recklessly, (4) made with inducement to be acted on, (5) acted in reliance, and (6) causing injury. *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 613 (Ky. App.2011) (quoting *Bear, Inc. v.*

*Smith*, 303 S.W.3d 137, 142 (Ky. App. 2010)). Fraud in the inducement renders a contract voidable.[5] *Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 489 (6th Cir. 2001) citing *W.T. Langley v. FDIC*, 484 U.S. 86, 93-94, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) (citations omitted).[6] The Court will address both aspects of Plaintiffs' fraud in the inducement claim below.

### 1. Financial Statements

Plaintiffs argue that the fraud in the inducement claim for the allegedly fraudulent financial statements fails to meet Fed. R. Civ. P. 9(b)'s particularly requirements. As to Rule 9(b), the purpose of the "particularity requirement of Rule 9(b) is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 679 (6th Cir. 1988). In deciding "a motion to dismiss under Rule 9(b) for failure to plead fraud with particularity, a court must also consider the policy favoring simplicity in pleading, codified in the 'short and plain statement of the claim' requirement of Federal Rule of Civil Procedure 8." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006). The Sixth Circuit has stated, "Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony." *Michaels Bldg. Co.*, 848 F.2d at 679. The Sixth Circuit has interpreted Fed. R. Civ. P. 9(b) "to mean a plaintiff must '(1) specify the statement that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *William Beaumont Hosp. Sys. v. Morgan Stanley & Co., LLC*, 677 Fed. App'x 979, 982 (6th Cir. 2017). Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b).

---

[5] A void contract, unlike a voidable contract, was never a contract. *Burden,* 267 F.3d at 488.

[6] Fraud in the factum or execution, "that is, the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents," renders a contract void. *Id.*

As to the allegedly false financial statements provided in due diligence, Defendants have alleged the statement that they contend were fraudulent (claim and litigation costs on financial statements) [*Id*. ¶¶ 33, 97-98], identified the speaker (Finn and financial statements) [*Id*. ¶¶ 33] and when and where the statements were made  (due diligence period relevant to the subject leases) [DE 40, ¶¶ 97-98]. The allegations also set forth the alleged fraudulent scheme (inducing Defendants to enter the parties' agreements) [*Id*. ¶¶ 33, 98 32, 101], the fraudulent intent of the Plaintiffs [*Id*. ¶¶ 32-33, 101], and the injury resulting from the alleged fraud [*Id*. ¶ 101]. These allegations set forth the minimum requirements for meeting Rule 9(b) to put Plaintiffs notice as to the substance of Defendants' claim for the alleged misrepresentation on the financial statements about the costs of lawsuits. But the general allegation that the financial statements were false beyond the representation on the costs of defending negligence and wrongful death actions is not pled with sufficient particularly. Thus Plaintiffs' motion to dismiss this aspect of the fraud in the inducement claim is **DENIED** as to the representation about the costs of defending negligence and wrongful death lawsuits but is **GRANTED** as to any other generally alleged misrepresentation about the financial statements for failure to plead with particularity.

## 2. Decertification of Beds

As to the allegedly fraudulent representation that beds would be decertified, Plaintiffs argue this claim fails on its merits. [DE 41 at 647]. Plaintiffs argue that a claim of fraudulent misrepresentation about a future promise is not actionable. Plaintiffs cite *Derby City Capital, LLC v. Trinity HR Services*, which cites *Mario's Pizzeria, Inc. v. Fed. Sign & Signal Corp*., 379 S.W.2d 736, 740 (Ky.1964) for the proposition that a claim for fraud must fail where it is "predicated upon . . .nonperformance of a contractual obligation . . . [s]uch nonperformance alone has frequently been held not even to constitute evidence of fraud." *Id*.   But the Court in *Derby City Capital*

explained that while promises of future conduct are normally not actionable as fraudulent misrepresentation, "a statement as to future conduct may form the basis for a misrepresentation claim if made with the intent to induce the other party to enter into a contract." *Id*. at 726 (quoting *Davis,* 399 F. Supp. 2d at 800.

Defendants allege that during negotiations, they worried about the number of beds at the Kirtland facility, and that Finn agreed in October and November 2016 that he would authorize decertification of excess beds at the Kirtland facility. [DE 40 at 420-21]. Defendants allege that the Plaintiffs wanted the transaction and transition of operation at Kirtland to occur before the bed certification could be completed and that Section 18.4 of the Amended and Restatement Master Lease was amended to give them assurances the excess beds would be decertified. At this stage of the proceedings, these allegations are enough to state a claim for fraud in the inducement.

Plaintiffs also argue that Defendants' reliance on Finn's statements about certification was not reasonable because Defendants were represented by counsel in negotiating the contract and Section 18.4 addressed the concern over bed certification. This argument involves question of fact. Plaintiffs also argue this aspect of the claim is not pled with particularity under Rule 9(b). As mentioned above, Rule 9(b) requires the plaintiff to plead with "(1) specify the statement that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *William Beaumont*, 677 Fed. App'x at 982. Defendants have alleged the content of the alleged misrepresentation (agreeing to authorize decertification) [*Id*. ¶ 48], the identity of the speaker (Finn), and when (during negotiations in October and November 2016) [DE 40, ¶ 47-48), the fraudulent scheme (inducing Defendants to enter the Amended and Restated Master Lease), the fraudulent intent of the Plaintiffs [*Id*. ¶ 103], and the injury resulting from the alleged fraud [*Id*.]. These allegations set forth the

minimum requirements for meeting Rule 9(b) to put Plaintiffs notice as to the substance of Defendants' claim for the alleged false representation about authorization of bed decertification.

The Plaintiffs' motion to dismiss on the fraudulent inducement claim is **DENIED**.

### F. Negligent Misrepresentation

Defendants claim Plaintiffs negligently misrepresented that they would apply the "Security Deposit to rent owed, waive all late fees related to past due rent, permit the decertification of excess licensed nursing home beds at the Kirtland facility, and reimburse Counterclaim Plaintiffs for bed purchases and rentals." [DE 40 at 428]. In Kentucky, a claim for negligent misrepresentation arises when a party: (1) in the course of [ ] business or a transaction in which [it] has a pecuniary interest, (2) supplies false information for the guidance of others in their business transactions, if (3) [it] fails to exercise reasonable care or competence in obtaining or communicating the information and (4) the plaintiff justifiably relied on the information. *KSA Enterprises, Inc. v. Branch Banking & Tr. Co.,* 761 F. App'x 456, 462 (6th Cir. 2019). Plaintiffs argue that these misrepresentations as alleged (applying the security deposit to rent, waiving late fees, decertifying beds, and reimbursing the bed rentals) are promises and agreements not actionable under a claim for negligent misrepresentation citing *KSA Enterprises*. [DE 41 at 650-51]. The Court agrees with Plaintiffs that the counterclaim for negligent misrepresentation fails as a matter of law because "a party's intent to perform a promise or an agreement cannot form the basis of a negligent misrepresentation claim." *KSA Enterprises*, 761 F. App'x at 462, citing *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 619 (Ky. App. 2011). Defendants cite no authority to the contrary [DE 42] and thus, the counterclaim for negligent misrepresentation is **DISMISSED**.

### IV.   CONCLUSION

For the reasons above, and being otherwise sufficiently advised, the COURT **ORDERS** that the Plaintiffs' Motion to Dismiss [DE 23] is **DENIED as moot** and the Plaintiffs' Second Motion to Dismiss [DE 41] is **GRANTED in part and DENIED in part** as set forth above.

Rebecca Grady Jennings, District Judge
United States District Court

March 21, 2022

Copies to:    Counsel of record