UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

GPH LOUISVILLE HILLCREEK LLC, et al.,                          Plaintiffs

v.                                              Civil Action No. 3:21-cv-63-RGJ

REDWOOD HOLDINGS, LLC, et al.,                                Defendants

* * * * *

**MEMORANDUM OPINION & ORDER**

Plaintiffs/Counterclaim Defendants GPH Louisville Hillcreek LLC, GPH Louisville Camelot LLC, GPH Louisville Mt. Holly LLC, GPH Louisville St. Matthews LLC, GPH Frankfort LLC, GPH Kirtland LLC, GPH Vanceburg LLC, GPH Stanford LLC, and GPH Greensburg LLC ("Plaintiffs") move for summary judgment. [DE 105]. Defendants/Counterclaim Plaintiffs Redwood Holdings, LLC ("Redwood"), Hillcreek Leasing, LLC, Camelot Leasing, LLC, Mt. Holly Leasing, LLC, St. Matthews Leasing, LLC, Frankfort Leasing, LLC, Kirtland Leasing, LLC, Vanceburg Leasing, LLC, Stanford Leasing, LLC, and Green Hill Leasing, LLC (all entities other than Redwood are "Facility Operators"); and Eli M. Gunzburg ("Gunzburg") (collectively "Defendants") responded [DE 110] and Plaintiffs replied [DE 113]. Plaintiffs also moved to exclude testimony from Defendants' expert Joseph H. Dabrowski ("Dabrowski"). [DE 106]. Defendants responded [DE 111] and Plaintiffs replied [DE 114]. These matters are ripe. For the reasons below, Plaintiffs' Motion for Partial Summary Judgment [DE 105] is **GRANTED** and Plaintiffs' Motion to Exclude Testimony of Dabrowski [DE 106] is **DENIED**.

## I.      BACKGROUND

This case involves a dispute between Plaintiffs, as landlords, and Defendants, as tenant, sub-tenants, and guarantor.  Plaintiffs are the owners of nine skilled nursing facilities in Kentucky and Kirtland, Ohio ("Facilities").  [DE 105 at 909].  On March 24, 2016, Gunzburg, who is the CEO and principal of Redwood, issued two non-binding indications of interest in assuming operation of the Facilities.  [DE 105-1, Gunzburg Dep. Tr., 939–40; DE 105-2].  Gunzberg had been engaged in the post-acute care industry for several years and involved in the sale or purchase of approximately 10 to 15 long-term care facilities.  [DE 105-1, Gunzburg Dep. Tr., 934–35].  He also holds a postgraduate degree in banking and finance.  [*Id.*].  Gunzburg proposed for Defendants to lease the Facilities from Plaintiffs for an initial lease term of 10 years with two 5-year extensions.  [DE 105-2 at 960, 964].  Rent would total $6,115,000 per year with an annual %1 increase.  [*Id.*].  Gunzburg retained counsel to assist with the transaction, including negotiations.  [DE 105-1, Gunzburg Dep. Tr., 937–38].

During the due diligence period, Gunzburg requested the loss runs for the Facilities reflecting their insurance claims for the preceding five years.  [*Id.*, 942–43].  Gunzburg provided this information to his insurance broker to get a quote on liability insurance for the Facilities.  [*Id.*, 944–46].  Based on the insurance quote, Gunzburg informed Plaintiffs that he would be unable to operate the Facilities on the terms he had previously proposed.  [*Id.*, 947–48].  In turn, Plaintiffs asked Gunzburg to identify terms under which he could agree to operate the Facilities.  [*Id.*, 948].  Gunzburg negotiated a three-year lease term at $2,195,000 for the first year.  [*Id.* at 948–50].

Gunzburg also expressed concern regarding the number of bed licenses at the Kirtland, Ohio facility.  [*Id.*, 951–52].  To prevent this issue from stalling the deal, the parties agreed to include a provision in the lease and deal with it after closing.  [*Id.*].  Before closing, the parties

negotiated a provision for the Master Lease that would address the conditions and terms

surrounding any request by Defendants to de-license beds at the facility in Kirtland, Ohio. [DE

105 at 910].   Gunzburg testified that he reviewed this provision before signing.   [DE 105-1,

Gunzburg Dep. Tr., 953–54].   Section 18.4 of the Amended and Restated Master Lease ("Master

Lease"), stated:

> Notwithstanding the foregoing, from time to time after the first Lease Year, Tenant
> may submit a written notice to Landlord requesting that Landlord approve the
> transfer, surrender or de-licensure of a portion of the Excess Beds no longer
> necessary for the continuing operation of the Facility located in Kirtland, Ohio (the
> "Ohio Property") in the Ordinary Course of Business. Such written request shall
> include a detailed description of Tenant's proposed plans and timeline for the
> transfer, surrender or de-licensure of such Excess Beds and shall also include
> detailed financial projections showing the financial benefit [of] such action.
> Provided that the proposed transfer, surrender or de-licensure of such Excess Beds
> will not, as determined by Landlord in its commercially reasonable judgment,
> negatively impact the value of the Ohio Property in any material respect, Landlord's
> consent to such action shall not be unreasonably withheld, conditioned or delayed.
> In the event Landlord approves of any such the [sic] transfer, surrender or de-
> licensure, all costs in connection therewith shall be borne exclusively by Tenant.

[DE 105-3 at 1005–1006].

Plaintiffs and Redwood entered the Master Lease [DE 105-3] on December 1, 2016, which

was amended by the First Amendment to Amended and Restated Master Lease [DE 105-4 ("First

Amendment")] on January 20, 2017.   The Master Lease, as amended by the First Amendment,

included initial annual rent of $2,195,000, a three-year lease term, and Section 18.4 related to

requests to de-license beds.   [DE 105-3; DE 105-4].   Gunzburg guaranteed the Master Lease.   [DE

1 at 6–7].   Redwood sublet or assigned the Master Lease to its wholly owned subsidiaries, the

Facility Operators. [*Id*. at 7].   The lease terms were collectively November 1, 2016 through October

31, 2019. [DE 105-3 at 1020].

On November 16, 2017, Defendants requested to de-license 60 beds at the Kirtland facility,

which Plaintiffs denied.   [DE 40 at 421–22].   Plaintiffs allege that as recently as March 2014, the

Kirtland facility had an average occupancy of 165 residents with only a few months where average occupancy fell below 120 residents. [DE 105 at 911 (citing DE 105-5)]. Defendants contend that if de-licensing beds would diminish property value, then Plaintiffs never would have agreed to any reduction in licensed beds. [DE 110 at 1229]. Gunzburg asserts that Nicholas Finn ("Finn"), Plaintiffs' representative, had agreed to a reduction in licensed beds prior to executing the Master Lease. [DE 110-7 at 1443]. But for Finn's representation, Gunzburg would not have executed the Master Lease. [*Id.*]. Defendants also contend that the Kirtland facility simply had more beds than the market would support after another nursing home was built nearby. [DE 110 at 1229]. Plaintiffs knew the number of occupied beds had decreased before the transition to Defendants' operation of the Kirtland facility. [DE 110-1, Andrews Dep. Tr., 91:22–92:1 ("Q: All right. Do you know what the census or the used beds were at Kirtland in the year prior to Redwood's operation of the facility. A: I did look at that. I believe they were in the 110 range prior to the transition."). The parties dispute the cause of this decrease in occupancy.

In December 2017, Plaintiffs received a notice of default from MidCap—Defendants' lender, [DE 105 at 912], constituting an event of default under Section 13.1.5 of the Master Lease. [DE 105-3 at 997]. Plaintiffs expressed concern regarding the consequences of Defendants' default and the Kirtland facility's devaluation if beds were de-licensed. [DE 105 at 912]. Despite this concern, Defendants contend that their default with MidCap did not absolve Plaintiffs of their obligation to exercise commercially reasonable judgment when approving requests to de-license beds. [DE 110 at 1229]. Although the Master Lease allowed Defendants to request de-licensure of beds, Plaintiffs contend that Defendants submitted no other written request to de-license beds at the Kirtland facility from January 1, 2018 through the end of the lease term. [DE 105 at 912].

4

Defendants failed to pay rent owed to Plaintiffs for the final three months of the Master Lease's initial term. [DE 105 at 912]. Plaintiffs contend that Defendants' failure to pay resulted from their default and certain tax delinquencies related to the facilities in Kentucky.[1] [*Id.*]. Defendants allege that Finn agreed to waive all the late fees associated with past-due rent in a phone call on August 15, 2019. [DE 40 at 419]. Defendants also assert that Finn agreed to apply the security deposit to August, September, and October 2019 rent during a September 10, 2019, phone call. [*Id.*]. Plaintiffs contend that Defendants did not make any new promises in exchange for Plaintiffs' alleged promises. [DE 105 at 913]. At the expiration of the Master Lease, Defendants surrendered possession of the Facilities. [*Id.*].

Based on these facts, Plaintiffs sued Defendants for breach of the Master Lease and Gunzburg for breach of guaranty. [DE 1]. Defendants asserted six counterclaims against Plaintiffs: (1) breach of contract regarding (a) security deposits, (b) de-certification of beds, (c) capital expenditures, and (d) purchase of beds and rentals; (2) unjust enrichment; (3) promissory estoppel; (4) conversion; (5) fraud in the inducement regarding (a) financial statements and (b) de-certification of beds; and (6) negligent misrepresentation. The Court dismissed Defendants' negligent misrepresentation claim (Count VI) and any claim for fraudulent inducement based on misrepresentation as to the financial condition of the Facilities except as to the costs of negligence and wrongful death cases. [DE 64].

Plaintiffs now move to exclude the testimony of Dabrowski and seek summary judgment on all Defendants' counterclaims, except for Count I as it relates to the de-certification of beds. [DE 105; DE 106]. On April 18, 2023, the Court held a final pretrial conference ("Pretrial

---

[1] Although Defendants do not dispute the tax delinquencies, Defendants contend that "[t]he repayment of the 'bed taxes' is an issue between Defendants and the Commonwealth. Plaintiffs have not been harmed and do not plead any harm, arising from this delinquency." [DE 110 at 1229].

Conference") to discuss trial logistics and hear argument on the outstanding motions. During the hearing, Defendants agreed to dismiss Count II and Count V and made other concessions that will be further discussed below. Pretrial Conference Tr., 19:2–7, 21:18–20, April 18, 2023..

## II.    MOTION TO EXCLUDE TESTIMONY OF DABROWSKI [DE 106]

Plaintiffs move to exclude Dabrowski's testimony because it fails to satisfy the requirements of Federal Rule of Civil Procedure 26 and because it does not offer an expert opinion. [DE 106]. In response, Defendants contend that Dabrowski is qualified to offer an opinion and any error is harmless. [DE 111].

Among other claims, Plaintiffs allege that Defendants are liable to Plaintiffs for failure to properly maintain and repair the Facilities as required by Section 7.1 of the Master Lease:

> Tenant shall (a) keep and maintain each Facility in good appearance, repair and condition, and maintain proper housekeeping, (b) promptly make all repairs (interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen) necessary to keep each Facility in good and lawful order and condition and in compliance with all Legal Requirements, Insurance Requirements and Authorizations and to maintain each Facility in a high quality operating and structural condition for use for its Primary Intended Use, and (c) keep and maintain all Landlord Personal Property and Tenant Personal Property in good condition and repair and replace such property consistent with prudent industry practice. All repairs performed by Tenant shall be done in a good and workmanlike manner.

[DE 105-3 at 983].

Defendants disclosed Dabrowski on February 11, 2022, to testify about Defendants' adherence to Section 7.1 of the Master Lease. [DE 55-1]. Plaintiffs have argued that Defendants owe approximately $6.6 million in maintenance and repair costs pursuant to the Master Lease. [*Id.* at 721]. Dabrowski rebuts this conclusion and testifies that Defendants are owed approximately $354,000 under the same provision. [*Id.* at 722]. Dabrowski analyzes how Plaintiffs' expert

reached the $6.6 million value.  [*Id.* at 726–28].  He then offers his own calculation of the amounts

owed for maintenance and repair, which is used to reach the $354,000 sum.  [*Id.* at 728–30].

### A. Standard

The admissibility of expert testimony is set forth in Rule 702 of the Federal Rules of

Evidence.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
> > (a) the expert's scientific, technical, or other specialized knowledge will
> > help the trier of fact to understand the evidence or to determine a fact in
> > issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts of
> > the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, "the Supreme Court established a general

gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and

irrelevant."  *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (alteration and

internal quotation marks omitted).

> Under Rule 702 of the Federal Rules of Evidence, 'a proposed expert's opinion is
> admissible . . .  if the opinion satisfies three requirements.  First, the witness must
> be qualified by knowledge, skill, experience, training, or education.  Second, the
> testimony must be relevant, meaning that it will assist the trier of fact to understand
> the evidence or to determine a fact in issue.  Third, the testimony must be reliable.

*Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *In re Scrap Metal*

*Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008)).

The Court does "not consider 'the qualifications of a witness in the abstract, but whether

those qualifications provide a foundation for a witness to answer a specific question.'" *Id.* (quoting

*Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)).  The Court must determine whether

the witness is qualified to offer an opinion on the specific area of expertise. *In re Welding Fume*

*Prods. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at * 33 (N.D. Ohio Aug. 8, 2005)

("An expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge.").   "Under the Federal Rules of Evidence, the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth.  The weight of the expert's testimony must be for the trier of fact." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).

Along with qualifications, "[t]he Court must determine whether evidence proffered under Rule 702 'both rests on a reliable foundation and is relevant to the task at hand.'" *Powell v. Tosh*, 942 F. Supp. 2d 678, 686 (W.D. Ky. 2013) (quoting *Daubert*, 509 U.S. at 597).  To assist with this determination, the Supreme Court in *Daubert* laid out factors[2] for the courts to consider.  *Daubert*, 509 U.S. at 592–94. Courts have "stressed, however, that *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. . . . [i]n some cases . . . the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience." *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (finding that the *Daubert* factors "unhelpful" in a case involving "expert testimony derived largely from [expert's] own practical experiences throughout forty years in the banking industry [because] [o]pinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation") (internal citations omitted).  "[W]hether *Daubert*'s specific

---

[2] The *Daubert* factors include "[w]hether a 'theory or technique . . . can be (and has been) tested'; [w]hether it 'has been subjected to peer review and publication'; [w]hether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'; and [w]hether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999) (quoting *Daubert*, 509 U.S. at 592–94).

factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire Co.*, 526 U.S. at 139.

### B. Analysis

First, Plaintiffs contend that Dabrowski's expertise does not relate to the opinions, if any, offered in his expert report. [DE 106 at 1124]. Although Dabrowski admits that he is not qualified to interpret legal opinions, Defendants contend that he is qualified to render an opinion on the value of the maintenance and repair obligations for both parties under the Master Lease. [DE 111 at 1533]. Dabrowski is a project manager with more than 35 years of experience as a consultant to the construction industry. [DE 55-1 at 739]. He specializes in builder's risk losses. [*Id.*]. Dabrowski holds degrees in mechanical engineering and business. [*Id.*]. Dabrowski's qualifications allow him to offer the expert opinions on calculating maintenance and repair obligations. *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046, at * 33. Dabrowski's opinion will likely assist the trier of fact. *See Mannino*, 650 F.2d at 851. Plaintiffs contend that Dabrowski does not provide an expert opinion because Dabrowski states that he "performed a thorough, albeit a layman's plain language analysis of [the Master Lease]." [DE 55-1]. This statement reflects the fact that Federal Rule of Evidence 702 "prohibits expert witnesses from testifying to legal conclusions." *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016). Dabrowski is prohibited from providing an opinion on the legal interpretation of the Master Lease. *See id.* Yet the Court finds that Dabrowski is qualified to offer an opinion on the maintenance and repair obligations using the formulas set forth in his report. *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046, at * 33.

Next, Plaintiffs contend that Dabrowski does not offer relevant, admissible opinions. [DE 106 at 1123]. In response, Defendants argue that Dabrowski's opinion is relevant and properly identifies shortcomings in Plaintiffs' expert report. [DE 111 at 1533–34]. "Evidence is relevant

if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. In sum, Dabrowski opines that Defendants exceeded the requirements of Section 7 in the Master Lease, which entitles them to a refund. [DE 55-1 at 722]. This opinion directly contradicts Plaintiffs' claim that Defendant are liable for damages under Section 7. [DE 1]. Dabrowski's opinion would tend to make Plaintiffs' claim more or less probable. *See* Fed. R. Evid. 401(a). Dabrowski's opinion relies, largely, on his 35 years of experience, which satisfies the requirement that his opinion be based on a reliable foundation. *See First Tenn. Bank Nat. Ass'n*, 268 F.3d at 335.

To the extent that Plaintiffs object to Dabrowski's report being titled as "preliminary" [DE 106 at 1121], Defendants contend that this designation was merely to reserve the right to amend based on later depositions [DE 111 at 1533]. Plaintiffs have not cited a case disqualifying Dabrowski's opinion on this basis alone [DE 106], so the Court finds no error. Plaintiff also contends that Dabrowski offers no meaningful opinions when disagreeing with their own expert. [*Id.* at 1125]. Dabrowski's opinion notes several points of disagreement with Plaintiffs' expert. [DE 55-1 at 725–30]. Each opinion provides varying degrees of detail but explains his reasons for disagreement. [*Id.*]. Plaintiffs' objections go to the weight of Dabrowski's testimony, not the legal merits. Questions of weight must be preserved for the trier of fact and are inappropriate for a motion to exclude. *See Mannino*, 650 F.2d at 851. For these reasons, Plaintiffs' Motion to Exclude Testimony of Dabrowski [DE 106] is **DENIED**.

### III.    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DE 105]

Plaintiffs moved for summary judgment on all Defendants' counterclaims, except for Count I as it relates to the de-certification of beds.  [DE 105].  In response, Defendants contend that questions of fact remain on each counterclaim.  [DE 110].

#### A.  Standard

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion.  *Id.* at 252.

The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party.  *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000).  But the nonmoving party must do more than show some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Liberty Lobby*, 477 U.S. at 252.

Rule 56(c)(1) requires that a "party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## B.  Breach of Contract

Plaintiffs argue that Defendants counterclaims for breach of contract fail under the Master Lease. [DE 105 at 914]. Plaintiffs do not move for summary judgment on Defendants' breach of contract claim premised on Plaintiffs' declination to agree to de-license beds at the Kirtland facility. [*Id.*]. The Master Lease provides that it will be governed, construed, and enforced under the laws of Delaware except that the law of the "Situs State" governs procedures for enforcing, in the Situs State, provisional, and other remedies directly related to facilities and personal property "as may be required pursuant to the law of such Situs State, including without limitation the appointment of receiver" and as "necessary create, perfect and foreclose the security interest and liens created under this Lease." [DE 105-3 at 1011]. Plaintiffs note that the Master Lease is interpreted and enforced under Delaware law, which Defendants do not dispute, but states that the basic standards of contract interpretation are the same under Delaware and Kentucky law and thus, a choice-of-laws analysis is not required. [DE 105 at 915, n. 5]. The Court applies Delaware law to construe the Master Lease, and Kentucky law, if it is consistent.

Under Delaware or Kentucky law, a breach of contract claim requires: (1) the existence of a contract; (2) the breach of that contract; (3) damages flowing from the breach. *H-M Wexford LLC v. Encorp, Inc*., 832 A.2d 129, 140 (Del. Ch. 2003), *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009). The interpretation of a contract is a question of law.

*Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007) (citing *HIFN, Inc. v. Intel Corp.*, No. 2555-CC, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007)). To determine the meaning of a contract, courts begin with its plain language. *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016); *BLGH Holdings LLC v. enXco LFG Holding, LLC*, 41 A.3d 410, 414 (Del. 2012). Without an ambiguity, a court will enforce a contract strictly according to its terms based on the ordinary meaning of its language and without resort to extrinsic evidence. *Ky. Shakespeare Festival, Inc.*, 490 S.W.3d at 694; *BLGH Holdings LLC*, 41 A.3d at 414.

But if there is more than one reasonable construction of contractual language, then the contract is ambiguous. *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 615 (Del. 2003) ("Ambiguity exists 'when the provisions in controversy are reasonably or fairly susceptible of different interpretations.'" (quoting *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996))). But a contract is not ambiguous "simply because the parties disagree on its meaning." *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997).[3]

---

[3] Kentucky contractual construction is similar. "The construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. App. 2000) (citing *Hibbitts v. Cumberland Valley Nat. Bank & Tr. Co.*, 977 S.W.2d 252, 254 (Ky. App. 1998)). An "ambiguous contract" is one capable of more than one reasonable interpretation. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). "If an ambiguity exists, the court may look to extrinsic evidence to determine the intent of the parties." *Principal Life Ins. Co. v. Doctors Vision Ctr. I, PLLC*, No. 5:12-CV-00125-JHM, 2014 WL 6751201, at *6 (W.D. Ky. Dec. 1, 2014) (citation omitted). If a contract is unambiguous, however, it "will be enforced strictly according to its terms." *Elmore v. Commonwealth*, 236 S.W.3d 623, 627 (Ky. App. 2007) (citations omitted). "[A] court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear*, 103 S.W.3d at 106 (citation omitted). In other words, "[i]f there is no ambiguity, the court's analysis extends only to the four corners of the contract to determine the parties' intention." *Journey Acquisition-II, L.P. v. EQT Prod. Co.*, 39 F. Supp. 3d 877, 887 (E.D. Ky. 2014) (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000)).

The Delaware Statute of Frauds prohibits enforcement of any agreement "upon any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them, or upon any agreement that is not to be performed within the space of 1 year from the making thereof," unless the agreement is in writing signed by the party to be charged.  6 Del. C. § 2714(a). The Kentucky Statute of Frauds also requires that a lease of real estate for longer than one year be in writing and signed by the party to be charged.  KRS § 371.010(6).

### 1.  Security Deposit and Waiver of Late Fees

Defendants' counterclaim for breach of contract alleges that Plaintiffs breached the Master Lease by "failing and refusing to apply the Security Deposit to rent owed, failing and refusing to waive all late fees related to past-due rent, failing to return the Security Deposit . . ."  [DE 40 at 424].  Plaintiffs argue that the terms of the Master Lease do not support the counterclaim and would require a modification.  [DE 105 at 916].  Plaintiffs also allege Defendants cannot prove that the parties orally amended the Master Lease.  [*Id.*].  In response, Defendants state that Finn admitted to applying the security deposit to base rent.  [DE 110 at 1231].

Section 3 of the Master Lease provides:

The Security Deposit shall not be deemed an advance payment of Rent or a measure of Landlord's [Plaintiffs'] damages for any default under this Lease by Tenant, nor shall it be a bar or defense to any action that Landlord may at any time commence against Tenant. [DE 105-3 at 974].

Upon the occurrence of any Event of Default, Landlord, at its option and in such order as Landlord in its sole discretion may determine, may apply the Security Deposit to any (a) obligation of Tenant under this Lease, or (b) Losses that Landlord may incur in connection with, or related to, this Lease, or any Event of Default under this Lease . . . ." [*Id.* at 974–75].

The Master Lease also contains a no oral modifications clause in Section 24.11, which states in part: "This Lease constitutes the entire agreement of the parties with respect to the subject matter

14

hereof, and may not be changed or modified expect by an agreement in writing signed by the parties." [*Id.* at 1011].

"[G]enerally a new consideration is required in order for an attempted modification for a contract to be valid." *Vinaird v. Bodkin's Adm'x*, 72 S.W.2d 707, 711 (Ky. 1934). There must be some new obligation of the promisee or new benefit for the promisor for adequate consideration. *See, e.g., Huff Contracting v. Sark*, 12 S.W.3d 704, 707 (Ky. Ct. App. 2000). "Neither the promise to perform an obligation nor the actual performance of it will be a good consideration for a new contract, if the obligation, promised or performed, is an obligation which the party is bound to do by a subsisting contract with the other party." *Pool v. First Nat'l Bank of Princeton*, 155 S.W.2d 4, 6 (Ky. 1941). Contracts subject to the statute of frauds may not be materially modified without a writing. *See, e.g.*, *Farmers Bank & Tr. Co. of Georgetown, Ky. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 8–9 (Ky. 2005).

At the Pretrial Conference, Plaintiffs explained that Defendants' security deposits were applied to past due rent and that they were not seeking additional interest. Pretrial Conference Tr. 5:8–12. Defendants seek approximately $78,500 that they contend should be repaid from the security deposits. *Id.*, 5:21–6:5. In its Order on Plaintiffs' motion to dismiss, the Court questioned the strength of this counterclaim. [DE 64 at 777]. At that phase, however, the Court could not determine whether Defendants provided adequate consideration or whether the modification would materially alter the Master Lease. [*Id.*]. The plain language of the Master Lease specifies that Plaintiffs could apply the security deposit to unpaid rent at their discretion. *See Ky. Shakespeare Festival, Inc.*, 490 S.W.3d at 694. For Plaintiffs to have breached the Master Lease because they were *required* to apply a security deposit to unpaid rent, Defendants must prove the existence of an additional lease term.

Defendants have put forth no evidence in their briefing that they provided additional consideration in exchange for a modification to the Master Lease. [DE 110]. Instead, Defendants' corporate representative testified that nothing was offered in exchange to waive interest and late fees. [DE 105-6, Ammar Dep. Tr., 1082]. At the Pretrial Conference, Defendants represented that they did provide consideration in the form of continuing to operate the Facilities for an unspecified period. Pretrial Conference Tr., 7:17–8:13. An amendment to the Master Lease cannot be enforceable without adequate consideration. *See Vinaird*, 72 S.W.2d at 711. Defendants have provided no evidence of additional consideration other than their representation at the Pretrial Conference. Without more, the Court finds that Defendants did not provide adequate consideration to modify the Master Lease and include a term applying the security deposit to rent owed, waiving all late fees, and returning the security deposit. *See Pool*, 155 S.W.2d at 6.

Moreover, the Master Lease is governed by the statute of frauds. *See* 6 Del. C. § 2714(a); KRS § 371.010(6). Even if Defendants provided adequate consideration, an oral modification to the lease would be barred by the statute of frauds. The parties do not dispute that an amendment applying the security deposit to rent owed, waiving all late fees, and returning the security deposit would affect the value of the Master Lease by approximately $1.3 million. [DE 105 at 919; DE 110 at 1231]. A $1.3 million modification to the Master Lease would constitute a material modification. *See Farmers Bank & Tr. Co. of Georgetown, Ky.*, 171 S.W.3d at 8–9. Even assuming the Court only considered the $78,500 in dispute as opposed the $1.3 million difference in value to the lease, Defendants conceded that a $78,000 modification would be material. 6:6. Accordingly, such an oral amendment would be barred by the statute of frauds. *See Farmers Bank & Tr. Co. of Georgetown, Ky.*, 171 S.W.3d at 8–9.

16

Defendants have failed to establish that a factual dispute exists by citation to facts in the record. *See Shreve*, 743 F.3d at 136. Not only is the alleged oral modification barred by the statute of frauds, see *Farmers Bank & Tr. Co. of Georgetown, Ky.*, 171 S.W.3d at 8–9, Defendants have also failed to show that they provided adequate consideration for a modification, see *Pool*, 155 S.W.2d at 6. The Court finds that there is insufficient evidence on which a jury could reasonably find for Defendants. *See Liberty Lobby*, 477 U.S. at 252. Plaintiffs' Motion for Partial Summary Judgment [DE 105] is **GRANTED** as for Defendants' counterclaim for breach of contract on the application of the security deposit to past-due rent and the waiver of late fees.

### 2. Capital Expenditures

Defendants allege that Plaintiffs breached the parties' agreements by "failing to refund the Excess Capital Expenditures Amount." [DE 40 at 424]. The Master Lease required Defendants to spend a designated amount of money on each facility per year, which was defined as the "Required Capital Expenditure Amount." [DE 105-3 at 985]. The amount of capital expenditures made during a lease year was defined as the "Actual Capital Expenditure Amount." [*Id.*]. If the Actual Capital Expenditure Amount exceeded the Required Capital Expenditure Amount in a given lease year, then the excess was defined as the Excess Capital Expenditure Amount. [*Id.*]. Plaintiffs argue that Section 7 of the Master Lease reflected that Plaintiffs do not owe Defendants the Excess Capital Expenditure Amount upon termination of the Master Lease. [DE 105 at 920]. In response, Defendants contend that the Master Lease is silent regarding the Excess Capital Expenditure Amount, which creates a question of fact. [DE 110 at 1236].

Section 7.6.1 of the Master Lease provides:

> If, with respect to any Facility, the Actual Capital Expenditures Amount so made and reported by Tenant during a particular Lease Year is greater than the Required Capital Expenditures Amount applicable to such period . . . then, **(a) provided no Event of Default then exists hereunder**, . . . **Landlord shall pay to Tenant the**

> **lesser of (x) the Excess Capital Expenditures Amount or (y) the amount of funds then held by Landlord as Capital Expenditures Deposits with respect to such Facility**, and (b) to the extent that the Excess Capital Expenditures Amount exceeds the amount of funds then held by Landlord as Capital Expenditures Deposits with respect to such Facility, **such excess shall be credited against the Required Capital Expenditures Amount** for up to the next two (2) succeeding Lease Years with respect to such Facility.

[DE 105-3 at 986–87 (emphasis added)].   Defendants also had an obligation to provide Capital Expenditure Reports within 30 days of the end of a lease year, which included all capital expenditures made during the preceding lease year.  [*Id.* at 987].

The interpretation of Section 7, and other provisions of the Master Lease, is a question of law.  *See Seidensticker*, 2007 WL 4054473, at *2.  Based on its plain language, the Court finds that Section 7.6.1 is unambiguous.  *See Ky. Shakespeare Festival, Inc.*, 490 S.W.3d at 694.  There are two possibilities under this provision depending on which amount was less: (1) Plaintiffs would pay Defendants the amount held as Capital Expenditure Deposits or (2) Plaintiffs would credit the Excess Capital Expenditures Amount towards the Required Capital Expenditure Amount for up to two years.[4]  Defendants contend that the Master Lease is silent or ambiguous regarding what happens when the latter option applies at the end of the lease term.  [DE 110 at 1236].  In that case, Section 7.6.2 provides:

> Tenant's obligation to deliver the Capital Expenditures Report applicable to the last Lease Year, together with Tenant's obligation to deliver any Capital Expenditures Deposit associated therewith, shall survive the expiration or termination of this Lease. If, on the basis of such Capital Expenditures Report, **Tenant is entitled to a payment as described in Section 7.6.1 above**, then, notwithstanding anything to the contrary, such payment shall be due and payable to Tenant only as and when the conditions of Section 3.1 for the return of the Security Deposit have been met.

[DE 105-3 at 986].

---

[4] The Court also notes that Defendants wouldn't receive the benefit of Article 7.6 even if applicable because Defendants had failed to pay their rent.  Failure to pay rent constitutes and "Event of Default" under Article 13.1.1. [DE 105-3 at 996].  The parties did not make this argument, so the Court will not discuss it further.

Defendants' obligation to continue to provide Capital Expenditure Reports survives the lease term. [*Id.*]. Using the report, Plaintiffs would calculate whether Defendants were owed any amount under Section 7.6.1 at the end of the lease term. [*Id.*]. The Court finds that this provision, interpreted using its plain language, is similarly unambiguous. *See Ky. Shakespeare Festival, Inc.*, 490 S.W.3d at 694. Defendants testified that they never made a Capital Expenditure Deposit [DE 105-6, Ammar Dep. Tr., 1071–72], which would make that amount $0.00.[5] Defendants allege that their Excess Capital Expenditure Amount is $354,654.43. [DE 110 at 1237]. Because the Capital Expenditure Deposit of $0.00 is lower that the Excess Capital Expenditure Amount, Plaintiffs were only required to refund $0.00, the lesser amount under Section 7.6.1 [DE 105-3 at 986]. The Excess Capital Expenditure Amount could be applied to future Required Capital Expenditure Amounts, but Section 7.6.1 did not include a means for refunding the Excess Capital Expenditure Amount at the end of the lease term or during the lease term.[6] [*Id.* at 986–87].

Defendants have failed to demonstrate a factual dispute over the interpretation of Section 7 as applied to the Excess Capital Expenditure Amount. *See Shreve*, 743 F.3d at 136. The Court found that the plain language of Section 7 is unambiguous. *See Ky. Shakespeare Festival, Inc.*, 490 S.W.3d at 694. Therefore, it must strictly enforce Section 7 according to its terms without resort to extrinsic evidence. *See id.* The Court finds that there is insufficient evidence on which a jury could reasonably find that the Master Lease required Plaintiffs to refund Defendants' Excess Capital Expenditure Amount. *See Liberty Lobby*, 477 U.S. at 252. Plaintiffs' Motion for Partial Summary Judgment [DE 105] is **GRANTED** as to Defendants' counterclaim for breach of contract on the Excess Capital Expenditure Amount.

---

[5] At the Pretrial Conference, Plaintiffs also represented that the Capital Expenditure Deposits were $0.0. Pretrial Conference Tr., 8:22–24.

[6] Even if Defendants were entitled to their Excess Capital Expenditure Amount under 7.6.1., there is no indication that they met the conditions of Article 3.1 for the return of their security deposit.

### 3. *Purchase of Beds and Rentals*

Defendants allege that Plaintiffs breached the parties' agreements by "failing to reimburse [Defendants] for the bed purchases and rentals." [DE 40 at 424]. Plaintiffs argue that this claim cannot survive summary judgment because Section 5.1 of the Master Lease required Defendants to accept the Facilities on an "as is" basis. [DE 105 at 921]. They also argue that Defendants forfeited their right to reimbursement for bed purchases when they defaulted on the Master Lease. [*Id.* at 922]. In response, Defendants contend that Section 5.1 is inapplicable and that the Master Lease is voidable due to a hidden defect. [DE 110 at 1238]. Defendants also argue that Plaintiffs breached an oral contract, separate from the Master Lease, to reimburse Defendants for beds. [*Id.* at 1238–39].

In its Order on Plaintiffs' motion to dismiss, the Court held that a question remained related to the disposition of property purchased by Defendants once the premises was surrendered. [DE 64 at 780]. Under Section 6.1 of the Master Lease, Defendants had to "obtain and install all items of furniture, fixtures, supplies and equipment not included as Landlord Personal Property as shall be necessary or appropriate to operate each Facility." [DE 105-3 at 978]. The property obtained by Defendants under Section 6.1 was defined as "Tenant Personal Property." [*Id.*]. Section 14.3 of the Master Lease describes the disposition of Tenant Personal Property:

> **Provided that no Event of Default then exists**, in connection with the surrender of the Premises, Tenant may upon at least five (5) Business Days prior notice to Landlord remove from the Premises in a workmanlike manner all Tenant Personal Property . . . ; provided that Landlord shall have the right and option to purchase for itself or its designee the Tenant Personal Property for its then fair market value during such five (5) Business Day notice period, in which case Tenant shall so convey the Tenant Personal Property to Landlord or its designee by executing a bill of sale in a form reasonably required by Landlord. **If there is any Event of Default then existing,** Tenant will not remove any Tenant Personal Property from the Premises and instead will, on demand from Landlord, convey it to Landlord or its designee for no additional consideration by executing a bill of sale in a form reasonably required by Landlord. Title to any Tenant Personal Property which is

not removed by Tenant as permitted above upon the expiration of the Term shall, at Landlord's election, vest in Landlord or its designee; . . .

[DE 105-3 at 1001 (emphasis added)]. Thus, under this provision, if a default occurs, Defendants are required, upon demand from Plaintiffs, to convey its personal property to Plaintiffs.

The Court finds that the terms of this provision are unambiguous. *See Ky. Shakespeare Festival, Inc.*, 490 S.W.3d at 694. The Court has held the Master Lease is unambiguous and will be interpreted within the four corners of the document. [DE 64 at 780]. Defendants do not dispute that they were in default when Plaintiffs received a notice of default from MidCap. [DE 110 at 1228–29]. The Court has also held that Defendants were in default because Plaintiffs had no obligation to apply the security deposit to past-due rent. *Supra* Section III.B.1. Either occurrence constitutes an Event of Default under Section 13.1.1 of the Master Lease. [DE 105-3 at 996–98]. Because there was an Event of Default, property purchased by Defendants—including medical beds—became Plaintiffs' property. [DE 105-3 at 1001].

Defendants argue that the Master Lease is voidable based on Kentucky law. [DE 110 at 1238]. Defendants reasserted this argument during the Pretrial Conference. Pretrial Conference Tr., 9:15–10:7. Arguing that the Master Lease is void is entirely inconsistent with Defendants claim for breach of the same contract. *See Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 261 (Ky. Ct. App. 2007).

They also contend that Plaintiffs breached an oral contract to reimburse Defendants for purchased beds. [*Id.* at 1238–39]. This oral contract was allegedly worth $900,000 and negotiated prior to the execution of the Master Lease. Pretrial Conference Tr., 10:9–11:7. Because this agreement was negotiated prior to the execution of the Master Lease, it merged into the final agreement and is barred by the parol evidence rule. *See Childers & Venters, Inc. v. Sowards*, 460 S.W.2d 343, 345 (Ky. 1970) ("Where the parties put their engagement in writing all prior

21

negotiations and agreements are merged in the instrument, and each is bound by its terms . . ." (quoting *Hopkinsville Motor Co. v. Massie*, 15 S.W.2d 423, 424 (1929)).  Even if this alleged agreement was negotiated after execution of the Master Lease, Defendants conceded that the agreement would constitute a material modification to the Master Lease.  Pretrial Conference Tr., 11:5–10.  Therefore, this material modification would be barred by the statute of frauds.  *See Farmers Bank & Tr. Co. of Georgetown, Ky.*, 171 S.W.3d at 8–9.

Defendants failed to argue that the Master Lease is void on this basis or that there was separate agreement prior to their response brief.  [DE 40].  "It is well-settled that a plaintiff may not expand its claims to assert new theories in response to summary judgment." *Vonderhaar v. Waymire*, 797 F. App'x 981, 990 (6th Cir. 2020) (quoting *Renner v. Ford Motor Co.*, 516 F. App'x 498, 504 (6th Cir. 2013)).  "This rule exists to protect defendants from 'unfair surprise' when moving for summary judgment." *Id.* (quoting *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005)).  Accordingly, the Court finds neither of these arguments persuasive.

Defendants have failed to demonstrate a factual dispute regarding the interpretation of Section 14.3.  *See Shreve*, 743 F.3d at 136.  Because there was an Event of Default under the Master Lease, *supra* Section III.B.1., Section 14.3 entitles Plaintiffs to Tenant's personal property, which includes medical beds.  [DE 105-3 at 1001].  The Court found that the plain language of Section 14.3 is unambiguous.  *See Ky. Shakespeare Festival, Inc.*, 490 S.W.3d at 694.  The Court finds that there is insufficient evidence on which a jury could reasonably find that the Master Lease required Plaintiffs to refund Defendants for medical beds.  *See Liberty Lobby*, 477 U.S. at 252. Therefore, Plaintiffs' Motion for Partial Summary Judgment [DE 105] is **GRANTED** as to Defendants' counterclaim for breach of contract on the purchase and rental of medical beds.

### C. Fraud in the Inducement

Defendants base their fraud in the inducement claim on the assertion that between October and November 2016, Finn represented that Defendants would authorize the decertification of the excess licensed beds at the Kirtland facility.[7]  [DE 40 at 427].  Plaintiffs argue that Defendants' claim should be dismissed because the record does not reveal that Plaintiffs promised anything more than the language in Section 18.4 of the Master Lease.  [DE 105 at 925].  Plaintiffs also argue that Kentucky law prohibits recovery for fraud when a party to recover the same damages for breach of contract.  [*Id.* at 927].  In response, Defendants contend that the evidence supports their claim and that they are allowed to proceed on their breach of contract and fraudulent inducement claims.  [DE 110 at 1239–40].  However, Defendants concede that they cannot recover on their fraud claim if they recover on their claim for breach of contract.  [*Id.* at 1240–41].

"Fraudulent inducement 'attends conduct prior to striking the express or implied contract and alleges that one party tricked the other into contracting. It is based on precontractual conduct which is, under the law, a recognized tort.'"  *Lillard v. Univ. of Louisville*, No. 3:11-cv-00554-H, 2012 WL 5878715, at *4 (W.D. Ky. Nov. 21, 2012) (quoting *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 193 F.3d 415, 439 (6th Cir. 1999)).  A fraud in the inducement claim has six elements under Kentucky law: (1) material representation, (2) which is false, (3) known to be false or made recklessly, (4) made with inducement to be acted on, (5) acted in reliance, and (6) causing injury.  *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 613 (Ky. App. 2011) (quoting *Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. App. 2010)).  Fraud in the inducement renders a

---

[7] Defendants have forgone their claim for fraud in the inducement as it relates to negligence and wrongful death lawsuits.  [DE 110 at 1239].

contract voidable.[8]  *Burden v. Check Into Cash of Ky., LLC*, 267 F.3d 483, 489 (6th Cir. 2001) (citing *W.T. Langley v. FDIC*, 484 U.S. 86, 93–94 (1987) (citations omitted)).[9]

First, Plaintiffs argue that the record does not support Defendants' claim.  [DE 105 at 925]. Plaintiffs contend that they made no representations beyond that articulated in Section 18.4.  [*Id.*]. Gunzburg testified that he told Finn, before signing the Master Lease, the only way the Kirtland facility was viable would be to reduce the number of beds.  [DE 110-2, Gunzburg Dep. Tr., 1279]. In response, Finn stated that he did not want this issue to hold up closing.  [*Id.* at 1280].  Finn suggested adding a provision to the Master Lease that would allow the parties to deal with this issue after closing.  [*Id.*].  Finn assured Gunzburg that "he would permit the de-licensure of no less than 51 beds, upon request."  [DE 110-6 at 1443].  Gunzburg and his counsel reviewed these suggested terms before signing the Master Lease.  [DE 110-2, Gunzburg Dep. Tr., 1280].  Based on Gunzburg's deposition and affidavit, Plaintiffs have failed to satisfy their burden to prove that no genuine issue of material fact remains.  *See Celotex Corp.*, 477 U.S. at 322.  Drawing all inference in favor of Defendants, see *Celotex Corp.*, 477 U.S. at 322, a reasonable jury could find that Finn's assurances induced Defendants into signing the Master Lease.

Plaintiffs also contend that Defendants are barred from recovery on their fraudulent inducement claims under the economic-loss doctrine and the choice-of-remedies rule.  [DE 105 at 927–28].  The economic-loss doctrine prohibits recovery for "fraud claims where the damages plaintiffs seek are the same economic losses arising from the alleged breach of contract."  *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 414–15 (6th Cir. 2022) (quoting *Nami Res. Co. v. Asher Land & Min., Ltd.*, 554 S.W.3d 323, 335 (Ky. 2018)).  The economic-loss

---

[8] A void contract, unlike a voidable contract, was never a contract.  *Burden*, 267 F.3d at 488.

[9] Fraud in the factum or execution, "that is, the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents," renders a contract void.  *Id.*

doctrine prohibits the law of contract and the law of tort from dissolving into each other. *See id.* "Thus, where the 'fraud claim is indistinguishable from the breach of contract claim' the plaintiff cannot recover for the tort claim." *New London Tobacco Mkt., Inc.*, 44 F.4th at 414–15 (quoting *Nami Res. Co.*, 554 S.W.3d at 336). "A breach of duty which arises under the provisions of a contract between the parties must be addressed under contract, and a tort action will not lie." *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 792 (Ky. 2017). The Sixth Circuit has held that the economic-loss doctrine applies to the fraudulent inducement claims. *New London Tobacco Mkt., Inc.*, 44 F.4th at 415–16.

Defendants have asserted a breach of contract claim alleging Plaintiffs breached the Master Lease by failing to de-certify beds at the Kirtland facility. [DE 40 at 424]. Defendants' fraudulent inducement claim is based on the same failure to de-license beds. [*Id.* at 427]. Defendants may not recover for fraudulent inducement when the duty that was allegedly breached is based in contract. *See Superior Steel, Inc.*, 540 S.W.3d at 792. Under these facts, Defendants' breach of contract and fraudulent inducement claims are based on the same economic losses, which would prohibit at least one of those claims from continuing to trial. *See New London Tobacco Mkt., Inc.*, 44 F.4th at 414–15. In response, Defendants concede that they would not be entitled to recovery for both causes of action but contend that they are allowed to maintain their cause of action for fraudulent inducement. [DE 110 at 1240–41]. Defendants cite no additional fact or law in support of this argument. [*Id.*]. Accordingly, Defendants cannot pursue their breach of contract claim fraudulent inducement claim at trial. *See Superior Steel, Inc.*, 540 S.W.3d at 792.

At this stage, Defendants are also prohibited from pursuing inconsistent remedies under the choice-of-remedies rule. "Where an individual is induced to enter into the contract in reliance upon false representations, the person may maintain an action for a rescission of the contract, or

may affirm the contract and maintain an action for damages suffered on account of the fraud and deceit." *Radioshack Corp.*, 222 S.W.3d at 261 (citation omitted).   A party cannot pursue inconsistent remedies. *See New London Tobacco Mkt., Inc.*, 44 F.4th at 412–13 (citing *Hampton v. Suter*, 330 S.W.2d 402, 406 (Ky. 1959)).   A plaintiff must elect to either "seek recovery upon the claim of fraudulent inducement or the claim of breach of contract." *LV Ventures, LLC v. Schott*, No. 2011-CA-000473-MR, 2012 WL 5039235, at *5 (Ky. Ct. App. Oct. 19, 2012).   Here, Defendants have conceded that the Master Lease is a valid contract.   [DE 16 ("Defendants admit the Master Lease is valid.")].   At the Pretrial Conference, Defendants elected to forego their fraudulent inducement claim and pursue their claim for breach of contract on the same facts. Pretrial Conference Tr., 19:2–7.   Accordingly, Plaintiffs' Motion for Partial Summary Judgment [DE 105] is **GRANTED** as to Defendants' counterclaim for fraudulent inducement.

### D.  Conversion

Defendants assert a claim against Plaintiffs for conversion, alleging that Plaintiffs "interfered with [Defendants'] rights to and possession of the beds by using the beds for the care and treatment of nursing home residents after the Lease Term."   [DE 40 at 426].   Plaintiffs argue that the conversion claims must fail for the same reasons their breach of contract claims fail on these issues.[10]   [DE 105 at 929].   In response, Defendants contend that they did not default under the Master Lease.   [DE 110 at 1241].   Defendants also argued that their claim for conversion must prevail because of the verbal agreement that Plaintiffs would reimburse Defendants for purchased medical beds.   Pretrial Conference, 24:14–25:7.

The elements of a conversion claim are (1) ownership rights in a certain property, (2) the wrongful act of taking or disposing of property, and (3) causing damages.   *Davis v. Siemens Med.*

---

[10] Plaintiffs also argue that the economic-loss doctrine prohibits Defendants' conversion claim.   [DE 105 at 929].   The Court will not consider this argument because its analysis is based on alternative grounds.

*Sols. USA, Inc.*, 399 F. Supp. 2d 785, 801 (W.D. Ky. 2005), *aff'd*, 279 F. App'x 378 (6th Cir. 2008) (citing *Anderson v. Pine S. Cap., LLC*, 177 F. Supp. 2d 591, 603 (W.D. Ky. 2001); *Goss v. Bisset*, 411 S.W.2d 50, 53 (Ky. 1967)).  The Court has already held that Defendants were in default for multiple reasons.  *Supra* Sections III.B.1–3.  Moreover, the Court held that the oral agreement to reimburse Defendants for purchased medical beds was barred by the parol evidence rule and merged into the Master Lease.  *Supra* Section III.B.3.  Because Defendants were in default under Section 13.1.1 of the Master Lease, medical beds purchased by Defendants became property of Plaintiffs under Section 14.3.  [DE 105-3 at 1001].  Therefore, Defendants did not have the ownership interest required to claim conversion.  *See Davis*, 399 F. Supp. 2d at 801.  Defendants have failed to produce evidence that would allow a reasonable jury to find in their favor.  *See Liberty Lobby, Inc.*, 477 U.S. at 247–48.  Accordingly, Plaintiffs' Motion for Partial Summary Judgment [DE 105] is **GRANTED** as to Defendants' counterclaim for conversion.

### E.   Unjust Enrichment & Promissory Estoppel

Defendants assert a claim against Plaintiffs for promissory estoppel, alleging that Plaintiffs "made multiple promises . . . including, without limitation, that the Security Deposit would be applied to rent for the months of August, September, and October 2019, that all late fees for past due rent would be waived, that Counterclaim Plaintiffs would be authorized to reduce the number of licensed nursing home beds at the Kirtland facility, and that Counterclaim Defendants would reimburse Counterclaim Plaintiffs for the amounts expended to purchase and rent beds."  [DE 40 at 426].  Defendants allege that they "reasonably relied" on those promises by not "paying rent during the months of August, September, and October 2019," not "paying late fees," entering into the Master Lease, and "purchasing beds."  [*Id.*].

Defendants also assert a claim against Plaintiffs for unjust enrichment, alleging that they conferred "certain benefits upon [Plaintiffs] including, without limitations, use of the Security Deposit for great than 60 days following the conclusion of the Lease Term, use of the Excess Capital Expenditures Amount for greater than a reasonable period of time following conclusion of the Lease Term, the payment of expenses associating with operating excess license nursing home beds at the Kirtland facility, and purchase and rental of beds."  [*Id.* at 423].  Plaintiffs contend that both claims must be dismissed because the Master Lease governs the agreements between the parties.  [DE 105 at 930].  In response, Defendants contend that there was a separate oral contract that would allow these claims to proceed.  [DE 110 at 1241].

Under Kentucky law, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promissee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only be enforcement of the promise." *Sawyer v. Mills*, 295 S.W.3d 79, 89 (Ky. 2009).  To that effect, the required elements to state a claim for promissory estoppel under Kentucky law are: "(1) a promise; (2) which the promisor should reasonably expect to induce action or forbearance on the part of the promisee; (3) which does induce such action or forbearance; and (4) injustice can be avoided only by enforcement of the promise." *Schlenk v. Goodwill Indus. of Ky., Inc.*, No. 3:16CV-00601-JHM, 2016 WL 6836945, at *3 (W.D. Ky. Nov. 18, 2016). *See also Bergman v. Baptist Hosp. Sys., Inc.*, 344 F. Supp. 2d 998, 1003 (W.D. Ky. 2004); *McCarthy v. Louisville Cartage Co.*, 796 S.W.2d 10, 11 (Ky. App. 1990).

"The claim for unjust enrichment is a legal fiction created to permit recovery where equity says there should be recovery, although there is no recovery in contract." *Holley Performance Prods., Inc. v. Keystone Auto. Operations, Inc.*, No. 1:09-CV-00053-TBR, 2009 WL 3613735, at

28

*5 (W.D. Ky. Oct. 29, 2009) (citing *Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. App. 1987)). For a "[p]laintiff to prevail under unjust enrichment, it must establish three elements: (1) a benefit conferred upon [a] defendant at [the] plaintiff's expense; (2) a resulting appreciation of benefit by [the] defendant; and (3) inequitable retention of benefit without payment for its value." *MidAmerican Distrib., Inc. v. Clarification Tech., Inc*., 807 F. Supp. 2d 646, 680 (E.D. Ky. 2011)*, aff'd*, 485 F. App'x 779 (6th Cir. 2012).

Under Kentucky law, "[t]he doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed." *Codell Const. Co. v. Commonwealth of Ky.*, 566 S.W.2d 161, 165 (Ky. App. 1977). Where a contract applies and covers the subject matter of the unjust enrichment claim, unjust enrichment claims have been dismissed. *Res-Care, Inc. v. Omega Healthcare Investors, Inc*., 187 F. Supp. 2d 714, 719 (W.D. Ky. 2001); *Shane v. Bunzl Distrib. USA, Inc*., 200 F. App'x 397, 404 (6th Cir. 2006) (affirming dismissal of unjust enrichment claim due to explicit contract). Similar to a claim for unjust enrichment, promissory estoppel "cannot be the basis for a claim if it represents the same performance contemplated under a written contract." *Derby City Capital, LLC v. Trinity HR Servs*., 949 F. Supp. 2d 712, 729 (W.D. Ky. 2013).

Here, the Court declined to dismiss Defendants' unjust enrichment and promissory estoppel claims because the fraudulent inducement claim remained, and the parties had not addressed how the fraudulent inducement claim would affect the enforceability of the Master Lease. [DE 64 at 781–84]. Because the Court dismissed Defendants' fraudulent inducement claim, *supra* Section III.C., it no longer prevents the Court from considering whether the Master Lease is enforceable. The Master Lease covers the subject matter at issue in Defendants' claims for unjust enrichment and promissory estoppel. [DE 105-3]. Therefore, the Court must dismiss

Defendants' unjust enrichment and promissory estoppel claims.[11]   *See Derby City Capital, LLC*,
949 F. Supp. 2d at 729; *Codell Const. Co.*, 566 S.W.2d at 165.   Plaintiffs' Motion for Partial
Summary Judgment [DE 105] is **GRANTED** as to Defendants' counterclaims for unjust
enrichment and promissory estoppel.

IV.    **CONCLUSION**

Having thus considered the parties' filings and the applicable law, and being otherwise
sufficiently advised, the Court **ORDERS** that:

1.   Plaintiffs' Motion for Partial Summary Judgment [DE 105] is **GRANTED**; and

2.   Plaintiffs' Motion to Exclude Testimony of Dabrowski [DE 106] is **DENIED**.

Rebecca Grady Jennings, District Judge
United States District Court

April 24, 2023

cc:    Counsel of record

---

[11]   At the Pretrial Conference, Defendants conceded that the promissory estoppel claim must be dismissed.
Pretrial Conference Tr., 21:18–20.